UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

KIPP ACADEMY CHARTER SCHOOL

                              Plaintiff,

        -against-                                **Case No. 17-cv-01863 (DAB)**

UNITED FEDERATION OF TEACHERS, AFT NYSUT,
AFL-CIO,

                              Defendant.
--------------------------------------------------------------------x

---

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO STAY ARBITRATION

---

### BOND, SCHOENECK & KING, PLLC
Michael P. Collins
Attorneys for Plaintiffs
600 Third Avenue, 22nd Floor
New York, New York  10016-1915
Telephone:  (646) 253-2318

Dated:  April 5, 2017

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND .............................................................................. 4

       A.    KIPP Academy .......................................................................................... 4

       B.    The UFT and its Classroom Teacher CBA ............................................... 6

       C.    New York State Law Regarding Charter Schools and Their Labor Relations ....... 7

       D.    Noninvolvement of the UFT and Non-Application of the UFT CBA at KIPP ...... 8

       E.    KIPP Academy Teachers' 2009 Decertification Effort ......................... 9

       F.    The UFT Grievance ................................................................................ 11

       G.    The NLRB *Hyde* Decision ................................................................... 11

       H.    The UFT Arbitration Demand and KIPP's Response ............................ 11

       I.    The KIPP Academy Teachers' NLRB Decertification Petition and the UFT
             Blocking Charge ..................................................................................... 12

       J.    KIPP's ULP Against the UFT ................................................................ 13

III.   LEGAL ARGUMENT ...................................................................................... 14

       A.    Preliminary Injunction Standard ........................................................... 14

       B.    KIPP Academy Is Threatened With Irreparable Harm If The UFT Arbitration Is
             Not Stayed ............................................................................................. 15

       C.    KIPP Academy Demonstrates a Strong Likelihood of Success ........... 17

             1.    The NLRA and Federal Labor Law, Not New York Law, Governs
                   Determination of Whether There is an Agreement to Arbitrate. ...... 17

             2.    An Agreement to Arbitrate Cannot be Established by the UFT Under the
                   Federal Labor Law. ............................................................................ 18

             3.    KIPP Never Authorized DOE as its Bargaining Representative. ....... 20

             4.    The UFT CBA may not be applied because the UFT does not represent
                   KIPP teachers. ................................................................................... 21

       D.    KIPP Demonstrates Serious Questions for Litigation and the Balance of
             Hardships Tips Sharply in Its Favor. .................................................... 23

             1.    KIPP's claims present serious questions for litigation. ................... 23

             2.    The balance of hardships tips sharply in KIPP's favor. .................. 24

IV.    CONCLUSION .................................................................................................. 25

99576.1 4/5/2017

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Maintenance Corp. v. Local No. 32B-32J SEIU,*
    1980 WL 2056 (S.D.N.Y. Jan. 31, 1980) ...............................................................................14

*Allstate Ins. Co. v. Hisham Elzanaty,*
    929 F. Supp. 2d 199 (S.D.N.Y. 2013).....................................................................................24

*American Bridge v. Local 40,*
    1988 WL 80146 (S.D.N.Y. July 25, 1988) .....................................................................14, 16

*AT&T Technologies, Inc. v. Communication Workers of America,*
    475 U.S. 643 (1986)................................................................................................................18

*Baltimore Sun Co. v. NLRB,*
    257 F.3d 419 (4th Cir. 2001) .................................................................................................21

*Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler P.C.,*
    2008 WL 751353 (S.D.N.Y. 2008).....................................................................................2, 15

*Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.,*
    2008 WL 759353 (S.D.N.Y. Mar. 20, 2008) .....................................................................14, 15

*Beth Israel Hosp. v. NLRB,*
    437 U.S. 483, 98 S. Ct. 2463 (1978)......................................................................................20

*Brown v. C. Volante Corp.,*
    194 F.3d 351 (2d Cir. 1999), *cert. denied*, 529 U.S. 1004 (2000)........................................18

*Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council,*
    629 Fed. Appx. 152 (2d Cir. 2015)........................................................................................22

*Chicago Truck Drivers(Signal Delivery),*
    279 NLRB 904 (1986) ............................................................................................................19

*Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Funds Ltd.,*
    598 F.3d 30 (2nd Cir. 2010)..............................................................................................23, 24

*Cuyahoga Wrecking Corp. v. Laborers Int'l Union Local Union #210,*
    644 F. Supp. 878 (W.D.N.Y. 1986) .......................................................................................20

*District Council of Plasterers & Cement Masons,*
    312 NLRB 1103 (1993) ..........................................................................................................19

*Gesualdi v. Baywood Concrete Corp.,*
    2014 WL 4659265 (E.D.N.Y. Sept. 17, 2014) ......................................................................18

ii

*Global Aero Logistics Inc. v. Airline Pilots Ass'n Int'l.*,
  2008 WL 243 7766 (E.D.N.Y. June 17, 2008) .................................................15

*Hyde Leadership Charter School-- Brooklyn*,
  364 NLRB No. 88 (Aug. 28, 2016) ............................................................. *passim*

*International Ladies Garment Workers Union v. NLRB*,
  366 U.S. 731 (1961)..................................................................................21, 22

*Local 32B-32J, SEIU (Nevins Realty)*,
  313 NLRB 392 (1993), *enforced in relevant part,* 68 F.3d 490 (D.C. Cir.
  1995) ...........................................................................................................19

*Local 377, RWDSU, UFCW v. 1864 Tenants Ass'n*,
  2007 U.S. Dist. LEXIS 14766 (S.D.N.Y. 2007) *aff'd,* 533 F.3d 98 (2d Cir.
  2008) ...........................................................................................................23

*Mack Trucks, Inc. v. International Union*,
  UAW, 856 F.2d 579 (3d Cir. 1988), *cert. denied*, 489 U.S. 1054, 109 S. Ct.
  1316 (1989) ..................................................................................................21

*MF Global Holdings Ltd. v. Allied World Assurance Co.*,
  562 B.R. 55 (Bankr. Ct. S.D.N.Y. 2017) .....................................................24

*Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union*,
  975 F. Supp. 445 (E.D.N.Y. 1997) ...............................................................15

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1, 57 S. Ct. 615 (1937)...................................................................21

*NLRB v. New Assocs.*,
  35 F. 3d 828 (3d Cir. 1994)..........................................................................13

*NLRB v. Weingarten, Inc.*,
  420 U.S. 251, 95 S. Ct. 959 (1975)...............................................................21

*Panek v. Cimato Bros. Const., Inc.*,
  2007 WL 3033948 (W.D.N.Y. Oct. 15, 2007) ...............................................19

*Port Chester Nursing Home*,
  269 NLRB 150 (1984)...................................................................................22

*Rabouin v. NLRB*,
  195 F.2d 906 (2d Cir. 1952)..........................................................................18

*Sheet Metal Workers Local 9 (Concord Metal)*,
  301 NLRB 140 (1991) ...................................................................................19

iii

*Teamsters Local Union*
    *No. 988 (Emery Worldwide),* 309 NLRB 854 (1992)............................................................19

*Trustees of the UIU Health & Welfare Fund v. New York Flame Proofing Co.,*
    828 F.2d 79 (2d Cir. 1987)........................................................................................20

*Vringo, Inc. v. ZTE Corp.,*
    2015 WL 3498634 (S.D.N.Y. 2015).............................................................................24

*Woodlawn Cemetery v. Local 365,*
    930 F.2d 154 (2nd Cir. 1991)....................................................................................14

**Statutes**

29 U.S.C. §§ 151, 157..........................................................................................21

Charter Schools Act of 1998, Education Law Article 56, § 2850, *et seq.* ............................. *passim*

LMRA § 301 ..........................................................................................................14

National Labor Relations Act ............................................................................... *passim*

New York Public Employees Fair Employment Act, Civil Service Law Article 14..................2, 7

iv

I.    **INTRODUCTION**

KIPP Academy Charter School ("KIPP" or "KIPP Academy") seeks an order staying the arbitration demanded by the United Federation of Teachers ("UFT"), pending determination of KIPP's claim for a declaratory judgment that there is no agreement to arbitrate. The arbitration is to commence on June 14, 2017; it is demanded under a collective bargaining agreement ("CBA") which the UFT claims applies.

KIPP has never been a party to any collective bargaining agreement with the UFT requiring arbitration.  The wages, hours and working conditions of KIPP's teachers have never been established by the UFT CBA.  For its entire 16 year history, KIPP Academy has operated in the absence of a collective bargaining relationship with the UFT. The working terms of KIPP teachers have been set without involvement of the UFT and independently of the terms of the New York City Department of Education ("DOE") CBA under which the UFT demands arbitration.

Until its recent arbitration demand, the UFT never invoked the grievance and arbitration provisions of the CBA.  Moreover, it never alleged that the terms of that contract should apply. Despite strict time limitation periods in the UFT CBA for grievances and arbitration demands, at no time since KIPP's charter was granted in 2000 did the UFT ever raise the claim that KIPP breached the terms of the CBA, despite the fact that KIPP has openly and with UFT knowledge employed its teachers under terms and conditions different than those set in the CBA – including paying teachers more than has been provided for in the UFT CBA.  Disputes and complaints raised by KIPP teachers over the years have been handled and resolved exclusively under the process set forth in the KIPP Employee Handbook which does not provide for arbitration; such matters have never been handled under the grievance and arbitration provisions of the UFT CBA.

This case is a matter of tremendous significance for the hundreds of children who attend KIPP Academy.  It also carries enormous personal and professional ramifications for 80 teachers

and for KIPP's founders, who have invested their efforts and passionately held commitment for over 20 years to create an alternative, collaborative and nurturing educational experience for thousands of inner city children.  At stake is the unique educational experience that is at the heart of KIPP's mission – crafted for the benefit of students and their families through years of teacher-KIPP Academy collaboration that has never followed, and would not be possible, under the UFT CBA.

KIPP Academy and its faculty have relied on the UFT's more than 16 year acquiescence in their establishment of a school educating underserved children in a manner completely unavailable to them if the UFT agreement applied.  A stay of the UFT arbitration should be granted to permit resolution of the claims asserted in KIPP's complaint.  The circumstances of this case amply meet the requirements for the issuance of an order staying the arbitration under either formulation of the preliminary injunction standard: KIPP demonstrates irreparable harm, and both likelihood of success on the merits, and serious legal questions and a balance of hardships tipping sharply in KIPP's favor.

First, irreparable harm is undeniable:  "The Second Circuit has held that a party forced to arbitrate a dispute that is beyond the purview of an arbitration agreement suffers irreparable harm."  *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler P.C.*, 2008 WL 751353 (S.D.N.Y. 2008).  In addition to the fact that irreparable harm will occur as a matter of law if the arbitration is not enjoined, extraordinary irreparable disruption, turmoil and uncertainty will arise from preparation for and participation in the proceeding.

Second, KIPP Academy demonstrates both a likelihood of success on the merits, and "sufficiently serious questions on the merits to make them fair game for litigation."  *Id.*  The UFT has claimed that the legal basis under which arbitration is compelled rests on New York State law – the Charter Schools Act of 1998, Education Law Article 56 (the "CSA") and the New York Public Employees Fair Employment Act, Civil Service Law Article 14 (the "Taylor Law").  However, in August 2016, in *Hyde Leadership Charter School-- Brooklyn*, 364 NLRB No. 88

2

(Aug. 28, 2016) ("*Hyde*") the National Labor Relations Board ("NLRB") held that New York State law regarding charter school labor relations is preempted by the National Labor Relations Act ("NLRA"). New York State law regarding union representation and collective bargaining agreements is thus inapplicable and provides no support for the UFT. Indeed, the UFT has recently changed its position and now acknowledges that the NLRA is, in fact, controlling. Thus, there is no dispute the NLRA and Federal labor law provide the legal standards to determine whether there is an agreement to arbitrate. Under the NLRA and Federal labor law, no agreement to arbitrate can be established because:

- KIPP Academy never agreed to the UFT CBA.

- KIPP Academy never agreed to be represented for purposes of collective bargaining by the DOE.

- The UFT has waived any right to invoke the grievance and arbitration process.

- KIPP teachers never voluntarily chose to be represented by the UFT and have actively opposed UFT representation.

Finally, the balance of hardships weighs heavily in favor of an injunction. As described above, the hardship to KIPP is substantial. The relative hardship to the UFT is nonexistent. It has slept on its alleged rights for more than 16 years since KIPP was chartered. A delay in arbitration until determination of the question whether there is an agreement to arbitrate will be of no consequence to and impose no hardship on the UFT.

KIPP's motion is based on questions of law and undisputed facts. Accordingly it should be determined on the papers and does not require an evidentiary hearing. If the court, nevertheless, determines that it will conduct an evidentiary hearing, KIPP urges that it order a temporary stay of the arbitration to maintain the status quo until after the evidentiary hearing.

## II.   FACTUAL BACKGROUND

### A.   KIPP Academy

KIPP Academy was first granted a charter by the State of New York in 2000. Approximately 80 education professionals are employed there and 800 children attend kindergarten through eighth grade.  Corcoran Dec. ¶ 3; Johnson Dec. ¶ 4.

KIPP Academy originated out of the Knowledge is Power Program ("KIPP") which was first created in 1995 to provide educationally underserved children with a more dynamic and ultimately successful educational experience than in a traditional New York City public school. Teachers David Levin and Frank Corcoran were among those first responsible for introduction and implementation of the program at P.S. 156.  Corcoran Dec. ¶ 3-4.  One of the principal forces behind the success of the Knowledge is Power Program from its inception was the extremely dedicated and motivated teachers who participated in it.  They expended extra efforts, engaged in extra activities, exercised significant independence and initiative and spent more time with students than was provided for in the UFT CBA.  Corcoran Dec. ¶ 5.

After the CSA was enacted in 1998 to permit establishment of charter schools, Levin applied for a charter for KIPP Academy.  His was one of the first charter applications in the state. His objective was to expand the Knowledge is Power Program at P.S. 156 to become the foundation for operation of an entire new charter school.  Corcoran Dec. ¶ 6.

Levin was granted a charter and KIPP Academy opened in 2000 with approximately 220 students.  Although Levin's application sought to create a separate charter school, and P.S. 156 continued to operate and was thus not converted to a charter school, the charter granted to Levin established KIPP Academy as a "conversion" school – a traditional public school converted to a charter school.  Corcoran Dec. ¶ 7.  The KIPP Academy charter has been renewed 3 times since 2000.  Johnson Dec. ¶ 17.

KIPP's foundational principles are that an innovative, holistic approach to education provided by a deeply committed faculty are necessary to provide children growing up in low income neighborhoods the opportunity to achieve their full potential.  An essential element of

4

KIPP's mission has been to create and foster a rewarding and supportive work place for teachers, in which they are not bound by restrictive practices that frustrate the innovative educational process sought to be nurtured at KIPP.  Corcoran Dec. ¶ 8.

Since 2000, KIPP Academy has graduated more than 1,000 children in the South Bronx. Eighty-seven percent matriculated to college within 5 years of graduating from 8th grade, and over 50% of that number graduated from college---more than five times the national average for students from low-income communities.  KIPP Academy students have outperformed the district, NYC and New York State in almost every grade level in every year of its existence on New York State 3rd -8th grade English Language Arts and Math tests.  Johnson Dec. ¶ 16.

KIPP's personnel policies and employment terms and conditions have for years been embodied in an Employee Handbook, the terms of which each teacher agrees to in writing.  The Handbook has been developed over the course of years through collaborative efforts of administrators, teachers, and other stake holders.  Among other things, the KIPP Handbook establishes at-will employment, and includes provisions regarding standards of conduct, performance expectations and practices, compensation and benefits, time off work and leaves of absence, and operational policies and procedures.  These provisions promote the educational experience that KIPP seeks to provide to students, and to provide teachers with a working environment where they can exercise initiative and develop their own capabilities to their potential.  Corcoran Dec. ¶ 9; Johnson Dec. ¶ 5.

To further its objectives of providing a different, more effective and less conventional educational experience, KIPP and its teachers developed policies and practices that differ significantly from those applicable to public school teachers under the UFT CBA.  KIPP Academy has always maintained a work schedule and school year different than that of traditional public schools as provided in the UFT CBA.  KIPP teachers carry out duties that are not provided for in the UFT CBA.  For example, KIPP teachers work with students on designated Saturdays during the year, afterschool during certain school breaks, and return to

5

work earlier in the summer than is provided in the UFT CBA.  They maintain a high level of contact with students, parents and guardians.  KIPP teachers provide their phone numbers to students and are heavily involved in curriculum development.  These student-focused services are the essence of the KIPP program and could not be provided under the terms of the UFT CBA. Corcoran Dec. ¶ 10; Johnson Dec. ¶ 6.

Based on its desire to reward and compensate teachers for initiative and implementing the KIPP philosophy, KIPP Academy teachers and other staff receive higher pay than is set in the UFT CBA.  KIPP Academy teachers and staff are also sometimes paid bonuses and stipends not provided for in the UFT CBA.  Corcoran Dec. ¶ 11; Johnson Dec. ¶ 7.

The KIPP Handbook does not provide for a formal grievance process or arbitration. Consistent with KIPP's overall philosophy, it maintains a dispute resolution policy which sets forth an informal, multi-step, internal resolution process.  This dispute resolution policy has been used to resolve dozens of issues and disputes that have arisen with teachers at KIPP over the years.  The UFT grievance and arbitration process has never been used and until June 2016 the UFT never sought to invoke it.  Corcoran Dec. ¶ 12; Johnson Dec. ¶ 8.

### B.    The UFT and its Classroom Teacher CBA

The UFT is the collective bargaining representative for persons employed by the DOE in its public schools.  The UFT is, with the NYC DOE, party to a CBA covering the approximately 75,000 NYC public school teachers at approximately 2000 public schools.  The most recent UFT classroom teacher CBA was entered in 2014 and runs through 2018.  Prior to 2014 and since 2000, at least two other UFT classroom teacher CBAs were entered.  Johnson Dec. ¶ 3, Ex. 1.

The current 238 page UFT classroom teacher CBA addresses myriad standards and requirements that have never been applied at KIPP.  Among its many provisions, it includes a detailed section addressing teacher performance and discipline which has never been followed by KIPP.  Johnson Dec. ¶¶ 3-6, Ex. 1, pp. 147-167.  It also includes a detailed grievance process for disputes between teachers and the union, and the employer – the DOE.  The CBA imposes

99576.1 4/5/2017

arbitration of disputes that are not resolved in the grievance process.  The CBA sets strict time limits for the assertion of grievances, and particular procedures for different categories of grievances.  Johnson Dec. ¶ 8, Ex. 1, pp. 167-186.

C.       **New York State Law Regarding Charter Schools and Their Labor Relations**

Since its enactment in 1998, the CSA has permitted private individuals to establish a public charter school as an alternative to a traditional public school.  Public funds finance charter schools, but the establishment, operation and governance are carried out by private individuals. New York State Education Law, Article 56:  Charter Schools Act of 1998, § 2850, *et seq.* ("CSA").

The CSA permits the chartering of new "start-up" charter schools, and conversion of existing public schools to charter schools.  CSA § 2850(2); § 2851(3)(c).  Both start-up and conversion charter schools follow the same application and approval process, which, in 1999 for New York City schools, involved making an application to the Chancellor of the New York City Department of Education.  CSA § 2851(3)(a).

Prior to the NLRB *Hyde* decision, under the CSA, teachers in a start-up school were not deemed to be represented by a union unless the school had more than 250 students when it began.  CSA § 2854(3)(b-1).  Teachers in a "conversion" charter school were deemed to be represented by the existing union in the district in which the school was located, and they were deemed to be covered by the same CBA as applied at public schools in the district.  CSA § 2854(3)(b).  However the CSA provided that "a majority of the members of a negotiating unit within a conversion charter school may modify, in writing, a collective bargaining agreement…with the approval of the board of trustees of the charter school."  Neither union involvement nor union approval was required to modify the CBA in a conversion school.  CSA § 2854(3)(b).

The Taylor Law governing the employment and labor relations of public employees was deemed to apply to school employees, whether the charter school was a start-up or conversion.

7

CSA § 2854(a); New York Civil Service Law, Article 14 (Taylor Law).  The CSA and the Taylor Law were subject to administrative enforcement by the Public Employment Relations Board ("PERB").   PERB was empowered to among other things to receive and adjudicate improper employment practice charges and to conduct proceedings and determine issues relevant to charter school employee union representation.  Taylor Law §§ 206-209(a).

       **D.**       **Noninvolvement of the UFT and Non-Application of the UFT CBA at KIPP**

Prior to its chartering in 2000, while KIPP was a program within P.S. 156, the  P.S. 156 teachers were covered by the UFT CBA.   Corcoran Dec. ¶ 3.   However, those teachers participating in the Knowledge is Power Program, at all times, from its inception forward, worked under different terms and conditions of employment, set by KIPP, than were provided by the UFT CBA.  The KIPP teachers and administrators ignored CBA provisions, including but not limited to, terms regarding teacher schedules during the day, class size, classroom and outside of classroom duties, teachers availability to parents and students, expectations for work beyond the school day, including during Saturdays and school breaks, and teacher and administrator accountability. The UFT never objected to the departure by KIPP from the provisions of the UFT classroom teacher CBA.  The UFT's inaction and non-application of the UFT CBA continued after KIPP Academy was chartered.  Corcoran Dec. ¶¶ 5, 10, 13-14.

Because the charter identified it as a "conversion" school, the provisions of the CSA imposing automatic union representation ostensibly applied to KIPP and its teachers.  At no time did the KIPP Academy classroom teachers ever vote to have the UFT represent them.  They were subject to automatic, nonconsensual representation by the UFT and ostensible coverage by the UFT CBA, under the CSA and the Taylor Law.  Corcoran Dec. ¶ 18; Johnson Dec. ¶ 11.

For 16 years after KIPP Academy was chartered, and dating back five more years to the establishment of the Knowledge is Power Program, the UFT played no role in negotiating or setting the wages, hours or working conditions of KIPP Academy teachers and staff.  Although it had putative representative status under the CSA, other than collecting union dues, the UFT

99576.1 4/5/2017

never carried out any representative functions.  The UFT never negotiated on teachers' behalf, never chose union stewards who acted for the union in relation to the school, and it never objected to any of the myriad actions taken by KIPP Academy over the more than 20 years since establishment of the Knowledge is Power Program, that were inconsistent with the provisions of the successive UFT CBAs.  Corcoran Dec. ¶¶ 13-15; Johnson Dec. ¶ 10.

Prior to the 2016 arbitration demand which led to this suit, the UFT never objected to KIPP Academy terms and conditions of employment for teachers and staff and it has never challenged the KIPP Academy dispute resolution procedure.  It did not engage with KIPP on any issue related to the wages, hours or work conditions of KIPP teachers or staff when it was chartered in 2000, after any of the successive UFT classroom teacher CBAs since 2000 were negotiated, or in connection with any renewal or amendment of the KIPP Academy charter.  For 16 years, from 2000 until 2016, UFT never brought a grievance or sought arbitration under any UFT CBA.  For 16 years, the UFT never represented a single teacher in a disciplinary or termination situation.  Johnson Dec. ¶¶ 8, 10, 12; Corcoran Dec. ¶¶ 13-14.

For their part, KIPP and its teachers effectively exercised their right under the CSA as a putative conversion school not to have the UFT classroom teacher CBA applied to them.  Since 2000, the wages, hours, and other terms and conditions of employment for KIPP Academy charter school teachers were never those set by the UFT CBA.  From the beginning, in consultation with its teachers, and as reflected in the Employee Handbook and other policies and practices, KIPP Academy established its own compensation and working conditions, different from the UFT classroom teacher CBA covering the numerous ways in which KIPP Academy and its teachers were operating contrary to the UFT CBA.  Corcoran Dec. ¶¶ 9-10; Johnson Dec. ¶¶ 5-6, Ex. 1.

### E.   KIPP Academy Teachers' 2009 Decertification Effort

In 2009, KIPP Academy teachers filed a petition for decertification with PERB pursuant to the Taylor Law in which they sought a secret ballot election to formally establish that the UFT

9

did not represent them, and that the UFT CBA did not apply to them.   The decertification petition was prompted by concerns arising among KIPP teachers that the UFT was going to inject itself into KIPP Academy to make teachers and administration conform to the terms of the UFT CBA.   The concern was that such a circumstance would disestablish the successful KIPP approach to education and alter the teachers' working conditions.   Corcoran Dec. ¶ 16.

In support of their petition, KIPP teachers unanimously stated in a written petition that they endorsed the practices developed with KIPP including the KIPP Employee Handbook as their terms of employment – expressly rejecting the UFT and its CBA.   Corcoran Dec. ¶¶ 16-17, Ex. 4.   The UFT objected to the KIPP teachers' decertification petition and sought to block their vote.   It argued that under the CSA and the Taylor Law, KIPP teachers were automatically, and without their consent, represented by the UFT because it was a conversion charter school.   It claimed that the KIPP teachers could not themselves alone vote to decertify the UFT as representative; only a vote by a majority of the 75,000 teachers in the entire NYC public school system bargaining unit could decertify the UFT at KIPP Academy.   Collins Dec. ¶ 2; Corcoran Dec. ¶ 17.

PERB accepted the UFT argument and dismissed the KIPP teachers' decertification petition; they were not permitted to vote on whether they wanted UFT representation.   Although PERB sustained automatic, non-consensual representative status of the UFT under New York law, it noted in its decision that the UFT had never sought voluntary recognition as their bargaining representative, had never been recognized by KIPP as bargaining representative, and there was no evidence that KIPP Academy staff had asked the UFT to negotiate for it.   Corcoran Dec. ¶ 17; Collins Dec. ¶ 2, Ex. 1.

Following the KIPP Academy teachers' unsuccessful 2009 decertification effort, the UFT continued its noninvolvement in KIPP Academy.   It did not take any action to represent KIPP Academy teachers or staff.   Nor did it object to the continued open fact that KIPP Academy teachers were not following the UFT CBA.   Corcoran Dec. ¶ 19; Johnson Dec. ¶¶ 8, 12.

10

### F.    The UFT Grievance

In June 2016, for the first time ever, the UFT alleged violations of a number of provisions of the UFT classroom teacher CBA.  It wrote to KIPP Administration complaining that:

- KIPP paid teachers higher salaries than the UFT CBA and did not follow other compensation-related provisions of the UFT classroom teacher CBA;

- KIPP paid teachers performance bonuses not provided for in the UFT CBA;

- KIPP teacher work schedules differed from the work schedules provided for in the UFT CBA; and

- KIPP's sick day policy differed from the UFT CBA.

Johnson Dec. ¶ 12, Ex. 3.

### G.    The NLRB *Hyde* Decision

Two months after the June 2016 letter from the UFT, the NLRB rendered its decision in *Hyde Leadership Charter School – Brooklyn,* 364 NLRB No. 88 (Aug. 28, 2016) in which it held that New York State law regarding charter school labor relations – the CSA and the Taylor Law – were preempted by the National Labor Relations Act ("NLRA").

### H.    The UFT Arbitration Demand and KIPP's Response

Soon after *Hyde* was decided, KIPP responded to the UFT June 2016 letter asserting that under *Hyde* "we believe a serious question exists as to the validity of a claim on the part of the UFT to represent employees of KIPP Academy charter school.  While KIPP Academy Charter School analyzes the situation and seeks guidance from the relevant agencies we do not believe it would be appropriate to respond to your recent requests and assertions of grievances."  Johnson Dec. ¶ 13, Ex. 4.

Ignoring KIPP's response, on November 7, 2016, the UFT served a demand for arbitration under New York State law and American Arbitration Association ("AAA") rules concerning 18 different alleged violations of 10 provisions of the UFT CBA.  The claimed violations were based on the KIPP Academy terms and conditions of employment including,

11

paying teachers more money and setting different work schedules than provided in the UFT CBA.  Johnson Dec. ¶ 14, Ex. 5.

KIPP requested that AAA delay processing of the arbitration demand, but AAA refused. Collins Dec. ¶ 4.  Based on an admonition in the UFT arbitration demand, KIPP filed an application in New York State Court for relief *pendente lite* seeking to stay an arbitration until the applicability of *Hyde* could be determined.  The UFT argued that the stay should be denied because the CSA and Taylor Law established UFT representative status and applicability of the UFT CBA.  It argued that the charter school in *Hyde* was distinguishable from KIPP because KIPP was a conversion charter and the NLRA did not apply to a conversion charter school.  Oral argument was conducted on KIPP's application on November 29, 2016 in the New York Supreme Court.  The application, without the UFT even being required to submit any written opposition, was summarily denied.  Collins Dec. ¶ 3.

Although KIPP objected at every step in the process to the UFT arbitration demand, AAA appointed an arbitrator and the arbitration is scheduled for June 14, 2017.  Collins Dec. ¶ 5-6.  Contemporaneously with this filing, KIPP intends to request the arbitrator adjourn the arbitration until KIPP's motion to stay is decided.  Collins Dec. ¶ 5.

## I.   The KIPP Academy Teachers' NLRB Decertification Petition and the UFT Blocking Charge

KIPP believes that in or around December 2016 or January 2017, the UFT learned that KIPP Academy teachers were organizing a petition to seek an NLRB election to establish that the UFT was not their bargaining representative.  Collins Dec. ¶ 8.  As it had done in connection with the 2009 KIPP teachers' PERB decertification effort, the UFT again sought to block an election that would permit them to vote on whether or not they wanted to be represented by the UFT.  Collins Dec. ¶ 7.

Before the KIPP teachers had even filed their election petition with the NLRB, on January 17, 2017, the UFT filed a preemptive NLRB unfair labor practice charge alleging that KIPP had "interfered with, restrained and coerced its employees in the exercise of rights

12

protected by Section 7 of the Act by threatening to retaliate against employees if they joined or supported a union." Such a charge is a common union tactic to prevent a decertification election because the NLRB usually precludes an election until the charge has been resolved. Collins Dec. ¶ 7. *See NLRB v. New Assocs.*, 35 F. 3d 828, 834 (3d Cir. 1994).

While the UFT may succeed in blocking or delaying the decertification vote, by filing its charge, the UFT *admits* that KIPP Academy and its teachers are under the jurisdiction of the NLRA, and thus, the CSA and Taylor Law do not govern questions relating to labor relations at KIPP. Collins Dec. ¶ 9.

On January 25, 2017, KIPP Academy Teachers filed a petition with the NLRB seeking a secret ballot election to establish that the UFT is not their collective bargaining representative. Collins Dec. ¶ 8. KIPP denies the UFT unfair labor practice allegations, and is providing information on its position to the NLRB. If a decertification election takes place, it will likely be months before it occurs. Collins Dec. ¶ 7.

**J.      KIPP's ULP Against the UFT**

On January 31, 2017, KIPP filed an unfair labor practice charge against the UFT alleging that its imposition of the UFT CBA on KIPP Academy violated the NLRA, as KIPP never agreed to it; by coercing KIPP in the selection of its bargaining representative by attempting to enforce a CBA between the union and a separate employer, the NYC DOE, and because the UFT is not the teachers' collective bargaining representative. Collins Dec. ¶ 10.

The NLRB is investigating KIPP's charge against the UFT. It is not known when the Board will complete its investigation or whether it will issue a complaint. Collins Dec. ¶ 11. Implicit in KIPP's charge against the UFT is the contention that the UFT CBA cannot lawfully be applied to KIPP under the NLRA. If the NLRB proceeds with the matter, it will necessarily have to decide that issue. Collins Dec. ¶ 12.

99576.1 4/5/2017

### III.   LEGAL ARGUMENT

#### A.   Preliminary Injunction Standard

The standard governing a motion to stay an arbitration is well settled:

> the movant must show: (a) irreparable harm, and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.  *See, e.g., Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir. 1993); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

*Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, 2008 WL 759353 (S.D.N.Y. Mar. 20, 2008).

The court unquestionably has the authority to stay an arbitration in connection with an LMRA § 301 suit.  In *American Bridge v. Local 40*, 1988 WL 80146 (S.D.N.Y. July 25, 1988), the court granted a preliminary injunction staying an arbitration in a situation similar to this case in which the employer denied both the existence of a CBA with the union and the union's representation of its employees.  There were, as here, also NLRB unfair labor practice charges pending.  Granting a stay of arbitration, the court stated:

> The critical concern for the court is that the controversy be settled
> in an orderly and consistent fashion.

*Id.* at *1.  *See also Woodlawn Cemetery v. Local 365*, 930 F.2d 154, 156 (2nd Cir. 1991) (staying an arbitration proceeding because it would be burdensome and wasteful to hold duplicative proceedings before the NLRB and an arbitrator); *Allied Maintenance Corp. v. Local No. 32B-32J SEIU*, 1980 WL 2056, at *2 (S.D.N.Y. Jan. 31, 1980) (holding "since the determination of the NLRB award will take precedence over the arbitrator's award, and since the NLRB decision will resolve the issue before the arbitrator, the arbitration proceeding will cause unnecessary expenditure and should be stayed.").

As in *American Bridge*, a stay should be granted to permit the orderly resolution of this dispute.  The required elements for a preliminary injunction are amply met by KIPP Academy.

14

**B.**      **KIPP Academy Is Threatened With Irreparable Harm If The UFT Arbitration Is Not Stayed.**

> Irreparable harm is " 'the single most important prerequisite for the issuance of a preliminary injunction.'   "*Reuters Ltd.*, 903 F.2d at 907 (quoting *Bell & Howell: Mamiya Co. v. Masel Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)).   Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Javaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (citing *Jackson Dairy*, 596 F.2d at 72).

*Barrack, supra,* 2008 WL 759353, at *5.

Being forced to arbitrate a matter a party has not agreed to arbitrate is *per se* irreparable harm.   In *Barrack*, *supra*, the plaintiff sought a preliminary injunction to stay an arbitration pending a declaratory judgment of the parties' rights.   *Id.* at *1.   The plaintiff contended that it was not bound by an agreement to arbitrate.   *Id.* at *2.   The court granted the preliminary injunction stating:

> Within the arbitration context, the Second Circuit has held that a party forced to arbitrate a dispute that is beyond the purview of the arbitration agreement suffers irreparable harm.   *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (citing *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997) ("[T]he time and resources [plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [arbitration agreement] or the Arbitration Act.")).   This consideration, therefore, necessarily leads to the second factor of the preliminary injunction standard.

*Id.* at *5; *see also Global Aero Logistics Inc. v. Airline Pilots Ass'n Int'l.*, 2008 WL 2437766 (E.D.N.Y. June 17, 2008) (preliminary injunction granted upon finding of irreparable harm when employer forced by union to arbitrate dispute pursuant to inapplicable CBA); *Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union*, 975 F. Supp. 445, 446-47 (E.D.N.Y. 1997) (relying on *Barrack*, irreparable harm found and injunction granted where arbitration demanded by union resisted by employer on grounds union did not represent its employees).

99576.1 4/5/2017

As in the above-cited cases, KIPP has no monetary remedy if it is forced to prepare for and participate in an arbitration in which it is not contractually obligated to participate. Accordingly, irreparable harm is directly imminent if the UFT arbitration is not stayed.  In addition to the irreparable harm arising as a matter of law, preparation for and participation in the UFT arbitration imminently threatens irreparable distraction from school activities, uncertainty and turmoil at KIPP Academy.  The arbitration is scheduled to begin during the final weeks of the KIPP Academy school year.  Rather than being able to focus solely on concluding the school year in an appropriate and effective way for its students, KIPP Academy administrators and teachers who are anticipated to participate in the arbitration will be distracted by pre-arbitration preparation.  Johnson Dec. ¶¶ 14-15; Corcoran Dec. ¶¶ 20-22.

Further, the very subject of the arbitration ensures turmoil and uncertainty at the school. Among the UFT's other claims are allegations that KIPP is paying teachers more and providing other consideration beyond what they would be entitled to under the UFT CBA.  In effect, the UFT is seeking to reduce compensation for teachers.  The worry and concern of teachers, and attendant distraction from students' needs, surely constitutes irreparable harm justifying a preliminary injunction.   This is particularly so where KIPP teachers have overwhelmingly exhibited a desire to be neither represented by the UFT, nor subject to its classroom teacher collective bargaining agreement. Johnson Dec. ¶¶ 14-15; Corcoran Dec. ¶¶ 20-21.

Irreparable harm also arises from the fact that the arbitration is an utter futility with regard to one of the central issues here – whether the UFT can be deemed to be a representative of KIPP teachers -- which necessarily must be determined in this case.  The proper forum for resolution of that issue is not arbitration.   The arbitrator has no authority to make that determination.  That issue can only be resolved by the Court in the context of this case, or by the NLRB. *American Bridge*; *supra*, 1988 WL 80146, at *1 ("The law is clear that an NLRB decision takes priority over a contradictory arbitrator decision").

16

C.     **KIPP Academy Demonstrates a Strong Likelihood of Success**

KIPP Academy will prevail on its claim that it is not subject to an agreement to arbitrate. It demonstrates likelihood of success because:

- The Federal law, not New York State law, applies to this matter.

- The UFT CBA cannot apply under the NLRA and Federal Labor law because KIPP never agreed to be bound by it.

- KIPP did not authorize the DOE as its bargaining representative.

- The UFT has waived any right to invoke the grievance and arbitration provisions of the CBA by its years of failure to object to KIPP's employment terms.

- The UFT cannot claim representative status in relation to KIPP employees under the NLRA, and thus an agreement allegedly entered on their behalf is a nullity.

> 1.     **The NLRA and Federal Labor Law, Not New York Law, Governs Determination of Whether There is an Agreement to Arbitrate.**

The UFT's position has been that KIPP's obligation to arbitrate arises as a matter of New York State law under the CSA and the Taylor Law. It contends that under those statutes, KIPP was automatically bound by the UFT CBA and the UFT was automatically, non-consensually, the collective bargaining representative for KIPP teachers. Collins Dec. ¶ 9.

The NLRB *Hyde* case – in which the UFT was a party – eviscerates the UFT's former position. In *Hyde*, the UFT filed a petition with PERB seeking to represent the *Hyde* Leadership Charter School's 35 teachers. The school filed a competing petition with the NLRB taking the position that the NLRA preempted New York State law regarding charter school employees and that a representation election should be conducted by the NLRB, not PERB. The UFT argued that the charter school was a political subdivision of the state to which the NLRA could not be applied and that the Taylor Law and the CSA governed questions concerning representation of charter school teachers. The NLRB held that *Hyde Leadership* charter school was not a political subdivision of the state because it was created by private individuals, not the state, and it was not administered by individuals responsible to public officials or the general electorate. *Hyde*, *supra*, 364 NLRB No. 88, at 7-12. The NLRB concluded that since the school was not a political

subdivision of the state, the National Labor Relations Act governed, not the New York CSA and Taylor Law.  It ordered that a representation election be conducted by the NLRB, not PERB.  *Id.*

Like Hyde Leadership charter school, KIPP was established by a private person – Dave Levin.  And the school administration and board of directors are comprised solely of private people, none of whom are answerable to a public official or the general electorate.  Corcoran Dec. ¶ 6; Johnson Dec. ¶ 17.

The UFT filing of an unfair labor practice charge with the NLRB alleging that KIPP violated the NLRA constitutes an admission by the UFT that KIPP is not a subdivision of the state, and that the NLRA and federal labor law, not the CSA and Taylor Law, apply to determination of the issues raised in this case.

> **2.    An Agreement to Arbitrate Cannot be Established by the UFT Under the Federal Labor Law.**

It has for decades been a fundamental principle of union-employer relations and general contract law that "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to so submit."  *See AT&T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

Under Federal labor law, a CBA is established by evidence of the parties' mutual assent evidenced by a written document signed by the party against which enforcement is sought, or by a longstanding course of conduct consistent with the CBA and its purported terms.  Accordingly, the adoption of an enforceable labor contract is dependent on either a written agreement or conduct manifesting an intention to abide by the agreement's terms. *See*, *e.g.*, *Brown v. C. Volante Corp.*, 194 F.3d 351, 355 (2d Cir. 1999), *cert. denied*, 529 U.S. 1004 (2000); *Rabouin v. NLRB*, 195 F.2d 906, 909-10 (2d Cir. 1952); *Gesualdi v. Baywood Concrete Corp.*, 2014 WL 4659265 at *4 (E.D.N.Y. Sept. 17, 2014).

KIPP Academy never entered a CBA with the UFT and it has never operated under the terms of the 2014 UFT CBA, or any predecessor CBAs, and it has never agreed to arbitrate with

18

the UFT.  Johnson Dec. ¶¶ 3-9; Corcoran Dec. ¶ 9-13.  The longstanding course of conduct by KIPP and UFT demonstrates the nonexistence of a CBA.  More specifically, it evidences the absence of an agreement to arbitrate.  Going back to the 1995 establishment of the KIPP Program and the 2000 chartering of KIPP Academy, three grants of recharters, and at least three successive UFT-DOE CBAs, the UFT never once invoked the grievance and arbitration process, or claimed violation of the CBA by KIPP.  Johnson Dec. ¶¶ 10, 12; Corcoran Dec. ¶¶ 13-14.

The UFT silence and inaction is made the more overpowering by the fact that through all the years, KIPP was operating outside of the terms of the UFT CBA openly and with UFT knowledge.  *See Panek v. Cimato Bros. Const., Inc.*, 2007 WL 3033948, *2-3 (W.D.N.Y. Oct. 15, 2007).  (Nonexistence of CBA shown where course of conduct contrary to alleged terms.)

An agreement to arbitrate under the UFT CBA may not be found for the additional reasons that the UFT violates Section 8(b)(1)(A) and (2) of the NLRA by seeking to enforce the terms of such an inapplicable agreement through the grievance process or otherwise.  *See District Council of Plasterers & Cement Masons,* 312 NLRB 1103, 1106 (1993) (union's attempt to enforce provisions of new CBA lacked reasonable good-faith basis where employer had properly withdrawn recognition; forcing employees into a bargaining relationship and to coerce employees to be represented by the respondents violated 8(b)(1)(A) and (2)); *Sheet Metal Workers Local 9 (Concord Metal),* 301 NLRB 140, 144 (1991) (pursuit of interest arbitration through grievance procedure and court proceeding where no valid interest arbitration clause was present lacked reasonable basis and thus restrained and coerced employees in the choice of their bargaining representative in violation of Section 8(b)(1)(B)).

Similarly, the Board has declared that the pursuit of grievances, in arbitration, to achieve ends that are not reasonably supported by contractual provisions constitutes an unfair labor practice.  *Local 32B-32J, SEIU (Nevins Realty),* 313 NLRB 392 (1993), *enforced in relevant part,* 68 F.3d 490 (D.C. Cir. 1995) (arbitration of contractual claim not reasonably based on language of contract is unfair labor practice); *Teamsters Local Union No. 988 (Emery*

19

*Worldwide),* 309 NLRB 854 (1992) (attempt to force merger of two historically separate bargaining units via arbitration is an "illegal objective"); *Chicago Truck Drivers(Signal Delivery),* 279 NLRB 904 (1986) (demand for arbitration in furtherance of union's effort to apply terms of CBA "to employees other than those for which the agreements were negotiated operated to restrain and coerce employees in violation of Section 8(b)(1)(A);" seeking to force merger of separate units through arbitration has no reasonable basis and is an illegal objective).

### 3.   KIPP Never Authorized DOE as its Bargaining Representative.

No CBA, or agreement to arbitrate between KIPP and the UFT was ever created because KIPP never authorized the DOE to be its bargaining representative.  It is black letter federal labor law that an employer cannot be bound to a CBA entered by a party allegedly acting on its behalf unless the employer actually authorized the party to act for it.  *See Trustees of the UIU Health & Welfare Fund v. New York Flame Proofing Co.*, 828 F.2d 79, 83-84 (2d Cir. 1987) (holding that it must be shown by a preponderance of the evidence that the employer manifested an unequivocal intent to be bound by that agreement); *see also, Cuyahoga Wrecking Corp. v. Laborers Int'l Union Local Union #210*, 644 F. Supp. 878, 880 (W.D.N.Y. 1986).

The 2014 UFT CBA was entered by the DOE, covering all DOE schools.  By operation of the Charter Schools Act, a "conversion" charter would be included with these "DOE schools" in bargaining conducted pursuant to the state's Taylor Law. KIPP Academy, of course, did not participate in any bargaining nor did it accede to representation in bargaining by the DOE. Johnson Dec. ¶ 3; Corcoran Dec. ¶¶ 13-14.   However, now, the NLRB's *Hyde* decision establishes that the CSA and Taylor Law are preempted – the employees of the charter school should rightfully have been covered by the NLRA.  Forced acceptance of a collective bargaining agreement that was never authorized – indeed forced acceptance of an entirely different statutory bargaining scheme – cannot be the basis of an agreement between KIPP Academy and the UFT. Under these circumstances, KIPP cannot be found to be bound by the UFT CBA.

20

99576.1 4/5/2017

4.    **The UFT CBA may not be applied because the UFT does not represent KIPP teachers.**

The United States Supreme Court has explicitly recognized that Congress "conferred [on the National Labor Relations Board] the authority to develop and apply fundamental national labor policy." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 500, 98 S. Ct. 2463, 2473 (1978).

A specific goal of that national labor policy, as declared in Section 1 of the statute, 29 U.S.C. § 151, is "to protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of . . . mutual aid or protection." *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 261-62, 95 S. Ct. 959, 966 (1975). In fact, "[e]mployee self-determination in the collective bargaining process is perhaps the most fundamental purpose of the National Labor Relations Act . . . ." *Baltimore Sun Co. v. NLRB*, 257 F.3d 419, 426 (4th Cir. 2001) (citing Section 7, 29 U.S.C. § 157) (emphasis added).

Toward that end, "Section 7 of the NLRA regulates the right of employees to organize and to engage in collective bargaining." 29 U.S.C. § 157; *Mack Trucks, Inc. v. International Union*, UAW, 856 F.2d 579, 584 fn. 6 (3d Cir. 1988), *cert. denied*, 489 U.S. 1054, 109 S. Ct. 1316 (1989). It is a "fundamental" right to be exercised, "without restraint or coercion," and has been recognized for nearly seventy years. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33, 57 S. Ct. 615, 621 (1937). Accordingly, as the Supreme Court has stated, "[t]here could be no clearer abridgment of § 7 of the Act, assuring employees the right to 'bargain collectively through representatives of their own choosing' or 'to refrain from such activity,'" than granting exclusive bargaining status to an agent that does not represent a majority of the workers in the unit. *International Ladies Garment Workers Union v. NLRB*, 366 U.S. 731, 737-38 (1961).

The KIPP Academy teachers have never voluntarily chosen to be represented by the UFT. In fact, they have never even been permitted to make the choice whether to be represented or not. Under such circumstances, the UFT CBA cannot be unilaterally and non-consensually foisted upon them. The UFT cannot be permitted to achieve through an arbitration which would

21

purport to decide the representational issue, what the UFT has never established under the NLRA – voluntary selection by a majority of KIPP teachers as their bargaining representative.

The Board's decision in *Port Chester Nursing Home*, 269 NLRB 150, 156 (1984), supports KIPP Academy's position that the UFT's attempt to arbitrate these representational issues is unlawful:

> "The Board has consistently held that the determination of questions of representation, accretion, and appropriate unit do not depend upon contract interpretation, but rather involve the application of the statutory policy, standards, and criteria, and are matters for decision solely by the Board rather than an arbitrator (internal citations omitted).
>
> The Board similarly held that consideration of 8(a)(2) allegations involves basic statutory principles rather than contract interpretation.  Thus, such allegations are matters to be heard exclusively by the Board and not by arbitrators.  Servair, Inc., 236 NLRB 1278 (1978).
>
> The issues presented to the arbitrator in the instant case did not involve an interpretation of the collective bargaining agreement between Respondent Employer and the Association.  Rather, they involved the basic representational issue as to whether Respondent Local 6 represented an uncoerced majority of Respondent Employer's employees and whether Respondent Employer was obligated to recognize Respondent Local 6.  Accordingly, whether this case be viewed as one where the arbitrator's decision was "repugnant to policies of the Act" within the rule of Spielberg, or as one where arbitration was inappropriate because the subject matter was peculiarly within the expertise of the Board, the arbitration award ought not in my judgment be given any effect by the Board.

The UFT cannot establish representative status in an arbitration.  Further, in the absence of representative status in relation to KIPP teachers, the UFT cannot claim to have entered into a binding CBA or agreement to arbitrate on their behalf.  *See Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council*, 629 Fed. Appx. 152 (2d Cir. 2015) ("Section 9 of the NLRA requires that a majority of a bargaining unit select a representative before that representative can bind the unit

22

to substantive terms and conditions"); *see also Local 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, 2007 U.S. Dist. LEXIS 14766 (S.D.N.Y. 2007) *aff'd*, 533 F.3d 98 (2d Cir. 2008) (citing *International Ladies'*, 366 U.S. at 736-38) ("[I]n order to form a valid collective bargaining agreement, the union must have majority support within the bargaining unit at the time the contract is executed").

**D.    KIPP Demonstrates Serious Questions for Litigation and the Balance of Hardships Tips Sharply in Its Favor.**

Even if the court were to disagree with KIPP and conclude that it has not demonstrated a likelihood of success on its claims, it should nevertheless grant an injunction because (1) the matter presents serious questions going to the merits to make them a fair ground for litigation, and (2) the balance of hardships tips sharply in KIPP's favor.

**1.    KIPP's claims present serious questions for litigation.**

> The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. *See, e.g., F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 815-19 (2d Cir. 1979).

*Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Funds Ltd.*, 598 F.3d 30, 35 (2nd Cir. 2010).

The UFT cannot deny that this matter presents serious questions for litigation under this standard.  The issues presented by KIPP's complaint are matters of first impression.  The NLRB's *Hyde* case set new law abrogating the CSA and Taylor Law and there are no court or NLRB cases addressing the question whether a charter school is bound to arbitrate under an alleged collective bargaining agreement arising under circumstances such as these.  The "serious questions" standard is ideally suited for a situation like this one as it "accommodates the needs of the district courts in confronting motions for preliminary injunctions in factual situations that

23

vary widely in difficulty and complexity." *Id.  See also, MF Global Holdings Ltd. v. Allied World Assurance Co.*, 562 B.R. 55, 66 (Bankr. Ct. S.D.N.Y. 2017) (non-frivolous arguments regarding nuanced issues presented sufficiently "serious questions" going to merits of claim to support issuance of preliminary injunction).

### 2.      The balance of hardships tips sharply in KIPP's favor.

"In considering the equities, 'courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Vringo, Inc. v. ZTE Corp.*, 2015 WL 3498634 at *10, (S.D.N.Y. 2015) (*quoting Winter v NRDC,* 555 U.S. 7, 24 (2008).  An arbitration delayed by a preliminary injunction (or stay) while a court determines whether a particular dispute is even arbitrable, is not a particularly significant hardship.  *Citigroup*, 598 F.3d at 40 (affirming district court's balancing of hardships finding that impact of delay in speedy resolution of grievance with broker-dealer via arbitration and added cost of litigating threshold arbitrability question did not outweigh hardship imposed on other party);  *Allstate Ins. Co. v. Hisham Elzanaty*, 929 F. Supp. 2d 199, 222 (S.D.N.Y. 2013) (despite clear right to arbitrate certain disputes, stay warranted under preliminary injunction standard while court resolved serious questions regarding  merits of claims); *MF Global*, *supra*, 562 B.R. at 65-67 (preliminary injunction staying arbitration granted while court determined coverage dispute notwithstanding insurers contention they were "being stripped of their bargained for arbitration  provision.")

As described above, the consequences of having to prepare for and participate in an arbitration, to which it never agreed, particularly at this juncture, presents extraordinary hardship for KIPP.  The school is about to enter the final quarter of its academic year and the arbitration is scheduled during the final week of that year.  Distraction of KIPP administrators and teachers who will be witnesses or called upon to participate in the preparation for the arbitration will create tremendous hardship and frustrate KIPP's *raison d'etre* – educating  children.

24

Further, the specter of an arbitration in which the UFT seeks to force KIPP not only to actually lower the compensation paid to teachers, but to substantially reduce the classroom hours for KIPP's students, is untenable.  Further hardship arises from the heightened level of uncertainty attendant to the question whether an arbitrator may impose the UFT collective bargaining agreement, which would have the effect of fundamentally altering  the KIPP workplace and its approach to educating children, in addition to  lowering teacher pay.

In contrast to the hardship KIPP will incur, a stay will not harm the UFT.  The working conditions about which it complains and seeks to arbitrate have existed for more than 16 years. The UFT has delayed taking action for two decades; potentially having to wait a few more months to impose an agreement that it essentially ignored for two decades can hardly be deemed a hardship.  Further, in the unlikely event an arbitration is ultimately ordered, if the UFT prevails, any theoretical prejudice could be addressed by the arbitrator.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons KIPP Academy urges that an order be issued staying the arbitration demanded by the UFT until the claims pleaded in the complaint are adjudicated.

Dated:  April 5, 2017                              BOND, SCHOENECK & KING, PLLC


By:  ___s/Michael P. Collins_____
         Michael P. Collins
**Attorneys for Plaintiffs**
600 Third Avenue, 22nd Floor
New York, New York  10016-1915
Telephone:  (646) 253-2318

25